# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

VIRLACE LEE HUNT, Individually and as
Natural Grandmother and Adoptive Mother and
next friend of, E.M., L.M. and S.M., minors,

       Plaintiffs,

vs.                                    No. CV- 03-0585 JB/LFG

VIRGINIA K. GREEN, individually, and
R. MICHAEL WESTBAY, individually,

       Defendants.

## <u>MEMORANDUM OPINION</u>

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed March 26, 2004 (Doc. 75).  The Court held a hearing on this motion on May 18, 2004.  The primary issue is whether the Defendants are entitled to qualified immunity, or, more specifically, whether: (i) the Defendants violated clearly established law in abrogation of the Plaintiffs' Fourth Amendment right to be free from unreasonable seizure; (ii) these Defendants violated the Plaintiffs' constitutional right to procedural due process; and (iii) whether the Defendants' actions shock the conscience of the Court and, thus, violate the Plaintiffs' substantive due process rights.  Because the Court finds that the Defendants violated clearly established law with regard to the Plaintiffs' Fourth Amendment rights, and that the Defendants did not violate the Plaintiffs' procedural or substantive due process rights, the Court will grant the motion in part and deny it in part.[1]

---

[1] The Court has previously entered an Order granting in part and denying in part this motion.  <u>See</u> Order, filed June 3, 2004 (Doc. 108).  This opinion is intended to explain more fully the Court's reasoning for its previous Order.

## FACTUAL BACKGROUND

Plaintiff, Virlace Hunt, is the maternal grandmother of Plaintiffs E.M., L.M., and S.M., minors.  See Complaint--Civil Rights ¶ 4, at 1-2, filed May 15, 2003 (Doc. 1)("Complaint").  At all material times, Defendant Virginia Green was  a social worker for the Children, Youth and Families Department of the State of New Mexico ("CYFD").  See id. ¶ 6, at 2.  At all material times, Green acted as the treatment social worker for E.M., L.M., and S.M.  See Vol. I Deposition of Virlace Hunt 77:22-78:3 (taken February 16, 2004).  Green was the treatment social worker for the minor children from approximately July 1999 until September 2000.  See Vol. I Deposition of Virginia Green at 67:13-20 (taken February 17, 2004).  At all material times, Green was a licensed independent social worker in the State of New Mexico, was a licensed drug and alcohol counselor, and a licensed psychotherapist.  See Vol. I. Green Depo. at 178:10 - 179:6.  CYFD assigned other treatment social workers to the case both before and after the Defendants' service on this case.  At all material times, CYFD employed Defendant Michael Westbay as a Social Worker Supervisor, and he was Green's supervisor.  See Complaint ¶ 7, at 2.  At all material times, Westbay possessed a Masters degree in Social Work from Columbia University, and was a licensed independent social worker in the State of New Mexico.  See Defendants' Answer to Interrogatory No. 4; Deposition of Michael Westbay at 24:25 - 25:3 (taken February 23, 2000).

At all material times hereto, the minor children, E.M., L.M., and S.M. were in CYFD's legal custody.  See id. ¶ 10-12, at 3.  The minor children, E.M. and L.M., were placed in Hunt's physical custody in June, 1998.  See id. ¶ 9, at 2-3.  The minor child, S.M., was born on July 4, 1999 and placed in Hunt's physical custody on or about July 5, 1999.  See id. ¶ 11, at 3.  At all material times, Christen Conley served as the guardian ad litem for E.M., L.M. and S.M.  See Vol. I Hunt Depo. at

40:8-10.

In October 1999, Hunt was cited for shoplifting and cruelty to children. <u>See</u> Vol. I Hunt Depo. at 192:15-193:3; Vol. II Deposition of Verlace Hunt at 53:13-14 (taken February 24, 2004); Incident Report, dated October 1, 1999. Although charged, she was never convicted of child abuse or endangerment. <u>See</u> Vol. II Hunt Depo. at 53:22-23. Ginger Robinson (Hunt's daughter), L.M., Hunt's eight-year old grandson Thomas, and S.M. accompanied Hunt into the store. <u>See</u> Vol. I Hunt Depo. at 179:13-24; <u>id.</u> at 194; 5-17; N.M. Child Abuse & Neglect Citizen Review Board Recommendation, dated May 1, 2000; Incident Report, dated October 1, 1999. Robinson and the children went in a different direction in the store than did Hunt. At the time of the alleged shoplifting, the children were with Robinson in a different part of the store and did not observe any alleged shoplifting. <u>See</u> Vol. II Hunt Depo. at 51:22-53:9. Hunt's grandson, Thomas, pushed the cart out the store's door. <u>See</u> <u>id.</u> at 52:21-24.

Hunt did not report the shoplifting incident to either the guardian ad litem or to Green. <u>See</u> Vol. I Hunt Depo. at 155:1-10. Hunt sought counseling for the event with a Dr. Sadek and reported to him that her "relapse" was due to multiple stressors, including frequent distressing phone calls from her daughter (Angel Hunt, the biological mother of S.M., L.M. and E.M.), misbehavior by her eldest granddaughter, and a child court appearance. <u>See</u> Mental Health / Social Services Encounter Record, dated October 21, 1999. Green learned of the shoplifting incident through a routine background check for foster parents' recertification. <u>See</u> Vol. I Hunt Depo. at 223:1-9.

Green learned from various sources about a relationship between Hunt and a boyfriend, Tom, and that the relationship might be a risk to the children based on Tom's drinking. <u>See</u> Vol. I Green Depo. at 96:23-97:17; Judicial Review Report / Reassessment, dated January 18, 2000. CYFD had

a protocol in place for investigating allegations of this nature, but Green did not feel there was any need to investigate. See id. at 98:18-101:22. There was no evidence of child abuse or neglect, and Green merely reported the boyfriend to her supervisors, including Westbay. See id.

At all material times, the Honorable Geraldine Rivera, District Judge, Division XXII, State of New Mexico presided over the abuse and neglect proceedings concerning the parents of E.M., L.M., and S.M. See Vol. I Hunt Depo. at 185:24-186:4. There were three Children's Court hearings: January 18, 2000, May 11, 2000, and July 24, 2000.

Before the January 18, 2000, hearing, the Defendants reported to the court knowledge of the shoplifting and "reports" about the "high stress primary relationship with a person who is currently incarcerated for DWI." Judicial Review Report / Reassessment, dated January 18, 2000. Green did not think these were "emergency" situations justifying removal of E.M. and L.M. from Hunt's physical custody. See Vol. I Green Depo. at 149:19 to 150:14. Although she felt it was a risk, Green did not believe Tom was living in the home and did not believe the situation was serious enough to warrant calling the placement foster care workers. See Vol. I Green Depo. at 100:1 - 101:19.

Solveig Maerki, the children's therapist, reported concerns to Conley regarding Hunt's relationship with Tom before the May 11 hearing. See Vol. II Deposition of Cristin Conley at 72:3-5; id. at 72:22-73:21; id. at 135:18-136:3; id. at 136:15 - 137:1; id. at 178:1-23 (taken March 23, 2004). Both the children and Hunt reported various issues regarding Tom to Maerki. See id. Conley discussed these concerns with Green. See id. Despite their knowledge of the shoplifting and the relationship, the Defendants still believed the children should remain in Hunt's custody. See id.; Vol. I Green Depo. at 102:23-103:20; id. at 107:1-14; Westbay Depo. at 56:4-25; In the Matter of [S.L.], a Child, and Concerning Angel M. Hunt and Eli Montour, Respondents, No. JQ-98-077, Transcript

of January 18, 2000 hearing at 3 (Second Judicial District, Children's Court Division, County of Bernalillo, State of New Mexico).

At the January 18 hearing, Green recommended continued  placement with Hunt, and stated that she would continue to support Hunt.  See Transcript of January 18, 2000 hearing at 3.  At that hearing, Conley "cautiously" agreed with CYFD's decision not to remove the children, but stated she was "horrified" that the daughter and grandson were involved in the shoplifting incident.  See id. at 8-10.  Judge Rivera expressed "concerns" about what the children were being exposed to.  See id. at 3-6.  On January 18, 2000, Green discussed with Hunt what happened at the hearing.  See Vol. I Green Depo at 94:1-11.

Before the May 11, 2000 hearing concerning S.M., Green learned from a school counselor that E.M. had visited with their biological father (Eli Montour), and that E.M. had told the counselor that "it was a secret."  Vol. I Green Depo. at 118:14 - 119:1; id. at 121:13-22.  Green asserts that she learned of this visit from Angel Hunt, the therapist, and the guardian ad litem, in addition to the school counselor.  See id. at 127:5-25.  Hunt did not report the visit to Green, and Hunt contends that she merely took her grandchildren to a Kentucky Fried Chicken establishment to eat, but did not know at the time that Angel Hunt and Eli Montour worked there.  See Vol. I Hunt Depo. at 176:14 - 177:4.  Hunt points out that Green did not confirm with Angel Hunt that a visit took place; rather, Green confirmed only that Angel and Virlace Hunt  were in contact with each other and that both biological parents worked at the Kentucky Fried Chicken.  See Vol. I Green Depo. at 120:5 - 122:20.  Green did not state that Angel Hunt told her that she visited with the children.  See id.  Green admitted that she had a suspicion that Hunt allowed the children to visit with their biological parents but she "didn't know for sure."  Id. at 127:15-17.  Conley advised the court that Hunt had said the

encounter with the biological parents had been accidental.  See Vol. II Conley Depo. at 177:2-10.

Conley stated at her deposition that she had no independent knowledge of these allegations concerning an unauthorized visit with the children's biological parents.  See Vol. II Conley Depo. at 135:18-21.  She had not investigated these allegations.  See id. at 143:4-8.  Conley confirmed that she had heard the allegations from Maerki, but did not know if Maerki had investigated them.  See id. at 135:21-136:6.  She did not, however, believe Maerki had investigated the allegations, because Maerki had heard them from the children.  See id. at 136:4-11.  Maerki testified that, when she discussed the allegations with Conley, they agreed that "it was not sufficient evidence for the children to be removed."  Deposition of Solveig Maerki at 135:11-24 (taken February 20, 2004).

Green called the school to check on the issue regarding the unauthorized visit and learned that E.M. had said Hunt had torn the neck on E.M.'s shirt and had pulled E.M.'s hair.  See Vol. I. Green Depo. at 212:1-9.  Hunt told E.M. to tell the teacher that E.M. had lied about the hair pulling incident out of "fear."   Vol. I. Hunt Depo. at 211:20 - 212:9.  Hunt lied to Green about the hair pulling episode because she was worried about what CYFD would think about it.  See Deposition of Sandra Montoya at 40:10 - 41:13 (taken February 13, 2004).

The May 11, 2000 hearing involved only S.M. and not the other two children.  See Transcript of May 11, 2000 hearing (caption reads: "State of New Mexico, ex rel Children Youth and Families Department In the Matter of [S.L.], Child, and Concerning Angel M. Hunt and Eli Montour, Respondents.").  Conley did not report to the court, during the May 11, 2000 hearing, that she had not investigated the allegations or that she had agreed with Maerki that these allegations were not sufficient evidence for removal.  See Transcript of May 11, 2000 hearing.  Conley did report to the court that Tom had been in and out of the home, that he had been in and out of jail, and that he was

currently in jail for DWI.  <u>See</u> Vol. I. Green Depo. at 129:25 - 130:1-17; Transcript of May 11

hearing at 6.  Conley reported that CYFD had not been made aware of Tom earlier, so "obviously

[CYFD had] not been to the home to confirm he was there."  Transcript of May 11 hearing at 6.

In fact, Green knew about the allegations concerning Tom as early as November 2, 1998, but

did not investigate them.  <u>See</u> Vol. I Green Depo. at 76:12 - 77:7; <u>id.</u> at 98:18 - 101:22.  Green

advised the court that Hunt had denied that Tom was living in the home.  <u>See</u> Vol. II Conley Depo.

at 177:12-16.  Green told the court on May 11, 2000 that Hunt was lying to her when Hunt denied

that Tom was living there.  <u>See</u> Transcript of May 11, 2000 hearing at 10.

At the May 11 hearing, Judge Rivera stated that she wanted S.M. removed immediately, and

that she wanted CYFD to investigate moving L.M. and E.M. because she did not believe Hunt's

residence was an appropriate place for the children to remain:

> THE COURT:  . . . . I don't think that the Department needs to waste any more time
> and I'm directing the Department to do a change of plan immediately and, you know,
> I'm not comfortable, I'm really not comfortable with the kids there.  What I'm afraid
> of is that Ms. Hunt is, you know, providing a holding pattern for a mother and father
> who have already been determined to be unfit.  I would like for the Department to
> investigate a change.  I'm not sure that I agree with the therapist and to see if we can
> get these kids placed, all three in one place, because it's not going to get any easier,
> if that's what she's worried about.
>
> *  *  *  *
>
> THE COURT:  But I'll tell you, based on what I have heard here today, I don't think
> Ms. Hunt is an appropriate place for them.
>
> *  *  *  *
>
> THE COURT:  Okay, it's time to move [S.L.] at a minimum, and I want the
> Department to investigate moving the girls.
>
> MS. GREEN:  [inaudible]

THE COURT:  If you can, fine.  I want [S.L.] moved now, okay?

Id. at 9:1 - 11:12.  Judge Rivera directed that she did not want an "emergency" move, but rather a ten-day move.  See id. at 11:11-16.  Section 32A-4-14(A), NMSA, requires ten days advance notice be given foster parents of changes in placement unless there is an "emergency" situation.

Green and Westbay did not believe that Judge Rivera ordered the removal of E.M. and L.M. See Vol. I Green Depo. at 151:11-21; id. at 281:25 - 282:5.; Westbay Depo. at 79:9-13.  Conley also did not believe that Judge Rivera had ordered the removal of E.M. and L.M., but thought she had ordered CYFD to explore or investigate whether the two older children should also be removed.  See Vol. II Conley Depo. at 59:9 - 61:12; id. at 107:1-20; id. at 129:11-25.

After the hearing, Green and Westbay, along with the County Operating Manager and Conley, made the decision to remove L.M. and E.M. at the same time they removed S.M., which was consistent with CYFD policy to keep siblings together.  See Vol. II Green Depo. at 274:14 - 275:16; Vol. II Conley Depo. at 129:11-25.  Conley had spoken to Maerki before the May 11 hearing; Maerki advised that she did not think the children should be removed, but that if S.M. had to be removed, all three children should be kept together.  See Vol. II Conley Depo. at 69:22 - 70:3; id. at 108:8-10.

After the May 11, 2000, hearing, Angel Hunt's attorney called Virlace Hunt to advise her that the court had ordered the removal of S.M.  See Vol. I Hunt Depo. at 113:20 - 114:5.  Hunt then left a message for Green to find out what had happened, and she received a return phone call from Westbay the same day as the hearing.  See id. at 114:7 115:1.  The Defendants assert that this phone call provided Hunt notice that all three children were to be removed.  Hunt contends that Westbay only told her that there was no urgency regarding the removal of the children, but it is unclear from Hunt's deposition whether Westbay indicated that all three children might be removed at some point.

-8-

See <u>id.</u> at 115:2-13.  Hunt also spoke with Conley who indicated the court ordered S.M.'s removal, but not the other two children because E.M. and L.M. were part of a separate case.  <u>See id.</u> at 115:19 - 116:4.

Green called Hunt on May 24, 2000, the night before the scheduled removal, and asked Hunt to make sure the children had their things together.  <u>See</u> Vol. I Hunt Depo. at 125:22-25; <u>id.</u> at 229:8-22.  After receiving the call from Green, Hunt told E.M. and L.M. that CYFD would be picking them up, and that she had broken the law and that is why CYFD was removing the children.  <u>See id.</u> at 126:1-8.  Hunt put the children's things together in boxes.  <u>See id.</u> at 126:16-18.  The children were at day care when CYFD removed them on May 25, 2000.  <u>See id.</u> at 125:14-17; <u>id.</u> at 229:8-22.

The Defendants assert that Hunt knew, shortly after the May 11, 2000 hearing, that all three children would be removed because Maerki stated that Hunt and the children had discussed the impending removal with her.  <u>See</u> Maerki Depo. at 106:20 - 107:12.  Hunt contends that, until the May 24, 2000 phone call from Green, she only knew that S.M. would be removed.  <u>See</u> Vol. I Hunt Depo. at 113:3-19.  At the Children's Court hearing on July 24, 2000, Judge Rivera found that CYFD had not abused its discretion in "placement."  <u>See</u> Transcript of July 24, 2000 hearing at 14.

At the time of the removal, the Defendants knew there was a strong familial bond between Hunt and the children.  <u>See</u> Judicial Review Report at 2, dated January 14, 2000; Maerki Report at 2-4, dated November 14, 2003.  The Defendants knew that removal from Hunt's custody could be detrimental or harmful to the children.  <u>See</u> Transcript of May 11, 2000 hearing at 6:18-22; Vol. I Green Depo. at 179:7-16.  The removal traumatized the children.  <u>See</u> Maerki Report at 3-5, dated November 14, 2003; Maerki Supplemental Report at 2-4, dated February 15, 2004; Maerki Depo.

at 78:2-21; Deposition of Danielle Becklund at 76-82 (taken February 10, 2004); Vol. II Deposition of Wilhelmina Francisco Tengco, M.D. at 32:10 - 40:24 (taken February 19, 2004). The removal also caused Hunt mental anguish. See Deposition of Sarah Palmer at 75:25 - 77:1 (taken February 18, 2004); Maerki Depo. at 106:20 - 107:5. As a result, the children will require weekly therapy sessions until they are at least 18 years of age. See Maerki Depo. at 117:2 - 118:21; id. at 120:20 - 121:8; Vol. II Tengco Depo. at 34:5 - 40:24.

Raindancer Youth Services placed E.M., L.M. and S.M. with the Tripp family for a few days before placing the children in a treatment foster home with a family named Singletary, which has special training to provide treatment foster care. See Beckland Depo. at 11:11 - 12:7. While in treatment foster care, Hunt and the children received both individual and family therapy through Raindancer. See id. at 14-17. After Raindancer placed the children with the Singletarys, Hunt obtained an attorney and intervened in the Children's Court proceedings. See Vol. I. Hunt Depo. at 131:25 - 132:13.

On August 23, 2000, Judge Rivera designated a Court-Appointed Special Advocate ("CASA"), whose job is to act as the court's eyes and ears, to investigate the case assigned by the court, to accumulate facts, and to report to the court with a recommendation. See Order of Appointment, dated August 23, 2000. In her January 29, 2001 report to the court, the CASA stated that the removal of S.M. in May, 2000, was based on allegations that were not investigated or substantiated. See CASA Report Form at 2, filed January 29, 2001. The CASA recommended that Hunt be made a part of the Treatment Plan with the children and that a previous home-study be updated for purposes of Hunt's adoption of the children. See id. Hunt adopted the children on August 27, 2002. See Vol. I Hunt Depo. at 5:5-7.

From personal observation, Sarah Palmer, Foster Parent Liaison for CYFD, believed that Green did not have a good working relationship with Hunt.  See Palmer Depo. at 58:2 - 59:25; id. at 61:13 - 62:8.  Green's interactions with Hunt were not based on sound professional judgment, but on personal issues with Hunt.  See id. at 97:24 - 100:9; Deposition of Elizabeth Kathleen DeWitt at 76:10 - 77:4 (taken February 21, 2004); id. at 130:5 - 133:22.  DeWitt, Plaintiffs' expert, has rendered the following opinions regarding the Defendants' handling of this case:

1.      Virginia Green and Michael Westbay failed to follow standard professional social work practice.

2.      Virginia Green allowed her own personal bias to cloud her professional judgment.

3.      Virginia Green failed to properly assess information she had heard from undisclosed sources.

4.      Virginia Green acted upon that information & caused the Court to act upon that information resulting in three small children being abruptly removed from their Grandmother's care without just cause or appropriate professional action.

5.      Virginia Green & Michael Westbay failed to consider the extensive information in the NM CYFD's files on Ms. Hunt which repeatedly and firmly describe Ms. Hunt as an appropriate, nurturing care giver for her three grandchildren.

6.      Virginia Green failed to follow NM CYFD's standards for service delivery by repeatedly failing to return phone calls to various individuals working with this family and failing to maintain the most minimal level of monthly contact with Ms. Hunt.

7.      Michael Westbay failed to properly supervise and/or train his subordinate.

DeWitt Report at 1; see also DeWitt Depo. at 102-103; id. at 124-133.

The Defendants move pursuant to rule 56(c) of the Federal Rules of Civil Procedure for summary judgment.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56.  In applying this standard, the record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998).  The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party.  See id. at 248.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Once a defendant raises the qualified immunity defense, the plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred."  Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 646 (10th Cir. 1988).  If the plaintiff meets this two-part burden, the defendant "assumes the normal summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute."  Woodward v. City of Worland, 977 F.2d 1392, 1396-97 (10th Cir. 1992).

With regard to the clearly established law requirement, the applicable test is whether a

reasonable official would have known the conduct was unlawful in light of information available at the time.  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  For the law to be clearly established, a Supreme Court or Tenth Circuit decision must be on point, or the clearly established weight of authority from other courts must be as plaintiff maintains.  See Murrell v. School Dist. No. 1, 186 F.3d 1238, 1251 (10th Cir. 1999).  The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Woodward v. City of Worland, 977 F.2d  at 1398.

## LEGAL ANALYSIS

## I.   THE DEFENDANTS ARE ENTITLED TO ABSOLUTE IMMUNITY WITH REGARD TO THE REMOVAL OF S.M.

"[A]n official charged with the duty of executing a facially valid court order enjoys absolute immunity from liability for damages in a suit challenging conduct prescribed by that order."  Valdez v. City & County of Denver, 878 F.2d 1285, 1286 (10th Cir. 1989)(Baldock J.).  The parties do not dispute that Judge Rivera ordered the removal of the youngest child, S.M.  Thus, in removing S.M., the Defendants were executing a facially valid court order and are entitled to absolute immunity.

The Plaintiffs assert that the Defendants are not entitled to any immunity with regard to any of the children because the Defendants procured the Court order by providing false or misleading information.  See Snell v. Tunnell, 920 F.2d 673, 691-92 (10th Cir. 1990)(declining to extend absolute immunity to social workers who "assisted or acquiesced in the use of information known to be false concerning the Snells . . . .  The use of that false information . . . was undoubtedly responsible for the furtherance of the investigation by use of a court order to gain entry into the Snell home[.]").  This argument does not persuade the Court to decline to recognize absolute immunity for the

Defendant's actions with regard to S.M..  To abrogate immunity on such a basis, a plaintiff must show that the official procuring the court order "assisted or acquiesced in the use of information known to be false."  The Plaintiffs assert that Green did so by failing to alert Judge Rivera that neither CYFD nor Conley had investigated  the allegations concerning Hunt's boyfriend Tom.  Further, Green represented to the Court that Hunt "lied" regarding her relationship with Tom.

The transcript of the May 11 hearing, however, establishes that Judge Rivera was aware that these allegations had not been investigated or substantiated.  See Transcript of May 11, 2000 hearing at 6:8-11 (where Conley informed Judge Rivera that CYFD had not been to Hunt's home to investigate the situation regarding Tom).  That Green did not make a point of highlighting whether there had been an investigation does not change the fact that Judge Rivera made her ruling knowing there had been no investigation.  Given the record in this case, the Court does not believe that Hunt has sufficiently established that the Defendants procured Judge Rivera's order through the knowing use of false information such that any immunity to which the Defendants are entitled must be abrogated.

In contrast to the clarity with which Judge Rivera dealt with S.M., the record shows that there is a question whether she intended to include the older two children within her order.  The Court believes that the best reading of the order is that Judge Rivera ordered the Defendants to remove S.M., but ordered the Defendants to investigate whether to remove the other two children.  It is particularly problematic to read Judge Rivera as ordering E.M. and L.M. removed given that the May 11th hearing only involved S.M.; E.M. and L.M. were the subject of a separate proceeding.  The Court thus does not believe Judge Rivera ordered E.M.'s and L.M.'s immediate removal.  The Court does not, therefore, believe that the Defendants are entitled to absolute immunity with regard to the

-14-

removal of E.M. and L.M.

The Court must nevertheless consider whether the Defendants are entitled to qualified immunity with respect to removing the older two children from Hunt's home.  Even if the Defendants are not entitled to absolute immunity based on their actions in effecting Judge Rivera's order with regard to S.M., they may still be entitled to qualified immunity for those actions.  The Court thus looks at the Defendants' actions with regard to all three children in the context of qualified immunity.

## II. THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY WITH REGARD TO  THE PLAINTIFFS' CLAIMS FOR UNREASONABLE SEIZURE UNDER THE FOURTH AMENDMENT.

In Count I of the Complaint, the Plaintiffs allege that the Defendants violated their constitutional right to be free from unreasonable searches and seizures pursuant to the Fourth Amendment.  The Fourth Amendment right in this case belongs to Hunt's minor grandchildren, and Hunt is asserting this Fourth Amendment right on their behalf.  See Hollingsworth v. Hill, 110 F.3d 733, (10th Cir. 1997)(holding that a mother had not asserted a Fourth Amendment violation on behalf of her children because the children were not included as plaintiffs in the action, but noting that "parents may assert their children's Fourth Amendment rights *on behalf of* their children.")(emphasis in original).  Because the children in this matter are joined as Plaintiffs, Hunt may, as their adoptive mother, assert the children's Fourth Amendment rights on their behalf.  See Transcript of Hearing at 70:2-18 (May 18, 2004)(counsel for plaintiff acknowledging that the Fourth Amendment rights belong to the children, but Hunt may assert those rights on behalf of her adopted children who are joined as plaintiffs).[2]

_____

[2] The Court's citations to the transcript of the hearing refer  to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

The Court must look, first, to whether the Plaintiffs have sufficiently placed in the record evidence showing a violation of their Fourth Amendment rights and, second, to whether the rights that the Defendants allegedly violated were clearly established at the time of the alleged violation. See Wilson v. Layne, 526 U.S. 603, 609 (1999)("A court evaluating qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.")(internal quotation marks and citation omitted).

## A.   THE PLAINTIFFS' ALLEGATIONS ESTABLISH A CONSTITUTIONAL VIOLATION.

The Plaintiffs assert that the Defendants removed S.M., L.M., and E.M. from Hunt's physical custody as a foster parent without a warrant or court order in violation of the Fourth Amendment right against unreasonable seizure.  The right to be free from unreasonable seizure under the Fourth Amendment prohibits the seizure of persons without a warrant or court order in the absence of exigent circumstances.  See Maryland v. Dyson, 527 U.S. 465, 466 (1999)(noting that the Fourth Amendment's prohibition on unreasonable searches and seizures generally requires police to secure warrant before conducting search); Roska v. Peterson, 328 F.3d 1230, 1242 (10th Cir. 2003)(holding that social workers violated the Fourth Amendment when they removed a child from his home without a warrant and in the absence of exigent circumstances).

The Defendants do not attempt to justify their allegedly warrantless seizure as conducted under exigent circumstances.  Rather, the Defendants contend:  (i) they had a court order; and (ii) if they did not have a court order, they nonetheless in good faith thought Judge Rivera ordered them to remove the children.  Because the Court, as noted above, does not believe that Judge Rivera

-16-

ordered the Defendants to immediately remove E.M. and L.M., the Court cannot find, as a matter of

law, that the Defendants had a warrant or court order.   At best, the May 11th transcript raises a

factual issue for the jury as to what Judge Rivera ordered.   Thus, there is a dispute on a material issue

of fact: whether the Defendants' removal of E.M. and L.M. was actually conducted pursuant to a

court order.

The parties in this case disagree whether an objectively reasonable social worker would have

relied on Judge Rivera's removal order of S.M. as including the two older children within its scope.

There is thus a dispute whether, even if there were no court order, an objectively reasonable social

worker could have concluded that Judge Rivera was ordering E.M.'s and L.M.'s removal. Because

of these issues of fact, the Court concludes that the Plaintiffs have sustained their summary judgment

burden as to the first question of qualified immunity, i.e., whether a constitutional violation occurred.

The Court must, therefore, consider the closely related issue whether, assuming the Defendants did

violate the Plaintiffs' constitutional rights, those rights were clearly established in May 2000.

**B.     THE DEFENDANTS WERE ON NOTICE THAT THEIR BEHAVIOR WITH REGARD TO E.M. AND L.M. VIOLATED THE PLAINTIFFS' CONSTITUTIONAL RIGHTS.**

In Anderson v. Creighton, 483 U.S. 635 (1987), the Supreme Court of the United States

considered whether an officer who effected a warrantless search of the plaintiffs' home was entitled

to qualified immunity.  The Supreme Court explained:

> It follows from what we have said that the determination whether it was objectively
> legally reasonable to conclude that a given search was supported by probable cause
> or exigent circumstances will often require examination of the information possessed
> by the searching officials. But . . . this does not reintroduce into qualified immunity
> analysis the inquiry into officials' subjective intent that Harlow sought to minimize.
> See Harlow[v. Fitzgerald, 457 U.S. 800, 815-20 (1982)].   The relevant question in
> this case, for example, is the objective (albeit fact-specific) question whether a

reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. <u>Anderson's subjective beliefs about the search are irrelevant.</u>

<u>Id.</u> at 641 (emphasis added).  Thus, in this case, the Court does not look to Green's and Westbay's beliefs about the reasonableness of their actions in removing all three children, but rather looks to the information that they possessed at the time.  The Court's concern is whether, in light of the clearly established law and the information that the social workers possessed, an objectively reasonable social worker in the Defendants' shoes would have been on notice that removing the two older children without a court order would violate their Fourth Amendment rights to be free from unreasonable search and seizure.

It is clearly established that a search or seizure requires a warrant or court order, in the absence of exigent circumstances or another exception to this requirement.  <u>See</u> <u>United States v. Karo</u>, 468 U.S. 705, 717 (1984)("Warrantless searches are presumptively unreasonable, though the Court has recognized a few limited exceptions to this general rule.").  The Court must, therefore, look to the information the Defendants possessed to determine whether an objectively reasonable social worker in their position would have believed either that they had received a court order with regard to E.M. and L.M., or that the circumstances of this case fell under an exception to that requirement.

The May 11, 2000 proceeding before Judge Rivera is captioned: "State of New Mexico, ex rel Children Youth and Families Department In the Matter of [S.L.], Child, and Concerning Angel M. Hunt and Eli Montour, Respondents."  Transcript of Proceedings, Partial Transcript of Children's Court Hearing, May 11, 2000.  The caption indicates that the two older children, E.M. and L.M.,

were not before Judge Rivera in that proceeding.  Judge Rivera's oral ruling regarding the removal of S.M. included the following comments:

> THE COURT:  . . . . I don't think that the Department needs to waste any more time and I'm directing the Department to do a change of plan immediately and, you know, I'm not comfortable, I'm really not comfortable with the kids there.  What I'm afraid of is that Ms. Hunt is, you know, providing a holding pattern for a mother and father who have already been determined to be unfit.  I would like for the Department to investigate a change.  I'm not sure that I agree with the therapist and to see if we can get these kids placed, all three in one place, because it's not going to get any easier, if that's what she's worried about.
>
> * * * *
>
> THE COURT:  But I'll tell you, based on what I have heard here today, I don't think Ms. Hunt is an appropriate place for them.
>
> * * * *
>
> THE COURT:  Okay, it's time to move [S.L.] at a minimum, and I want the Department to investigate moving the girls.
>
> MS. GREEN:  [inaudible]
>
> THE COURT:  If you can, fine.  I want [S.L.] moved now, okay?

Id. at 9:1 - 11:12.  The best reading of the transcript is that Judge Rivera stated that she wanted S.L. removed at that time and that she wanted CYFD to "investigate" removing E.M. and L.M.  Judge Rivera did not, at any point, explicitly state that she wanted the older children removed at that time. Thus, an objectively reasonable social worker in the Defendants' position would have known two key things: (i) that E.M. and L.M. were not properly before Judge Rivera in the May 11, 2000 proceeding, and (ii) that Judge Rivera never explicitly ordered the removal of the two older children. The Defendants do not argue that any exigent circumstances existed with regard to the older children requiring their urgent removal.  Nor do the Defendants point to any other exception to the

-19-

requirement that they get a court order before removal.  Thus, there is evidence in the record from which a trier of fact could conclude that the Defendants acted unreasonably in removing E.M. and L.M. without first obtaining a court order.

While the Court heeds Justice Scalia's admonition in Anderson v. Creighton regarding the relevance of the Defendants' subjective beliefs in determining whether they are entitled to qualified immunity, the Court does feel that the Defendants' -- as well as the guardian ad litem's -- deposition testimony statements lend further support to a determination that the Defendants acted unreasonably in contravention of clearly established law when they removed L.M. and E.M.  In her deposition, Green stated:

> Q:  Now, what did -- in May, Judge Rivera directed that [S.M.] be removed.  Is that right?
>
> A:  That's correct.
>
> Q:  And what did she say about [E.M.] and [L.M.]?
>
> A:  I'd have to look at the transcript exactly to be able to quote her, but I believe that she wanted us to consider removing them, as well.
>
> Q:  And they were actually removed, as well?
>
> A:  They were removed, as well.
>
> Q:  And who made that decision?
>
> A:  That was made by the department, by the county operating manager, by the supervisors.  It was made as a -- it was a departmental decision, and I was included in those staffings, and I think everybody talked about it and -- and the determination was made as a part -- that was a departmental decision, and I'm -- I would assume that the county operating manager would have also consulted the legal department, but I wasn't involved in -- at that level.  This would have also been consistent with department policies regarding sibling splits, and the department -- the department is -- feels very, very strongly about trying to keep siblings together, because once they are placed in different homes, there's the possibility that that might become a -- a

-20-

permanent situation, and so they try -- the department has very strong views about -- and policy about keeping siblings together.

Vol. II Green Depo. at 274:14 - 275:16.  Green also explained:

Q:  Anyway, was there an emergency requiring the removal of [E.M.] and [L.M.] from Virlace's home?

A:  I believe Mr. Lyons addressed that in the court, and the Judge said that she wanted a ten-day move.

Q:  And what did you understand that to mean?

A:  That she wanted the children moved in ten days.

Vol. I Green Depo. at 145:17-22.  Green clarified her understanding of whether she actually had a court order with regard to E.M. and L.M.:

Q:  In your entry on 5-23-2000, you met with Jesse Hall Anderson and Cristen Conley at Raindancer, discussed the possibility of a placement for all three girls.  Would you agree that at least as of that date there was no court order from the Court ordering the removal of the girls from -- no written order?

A:  There was -- I don't know if there was a written order or not.  That would have been something that Mr. Lyons would have been responsible for.  What I heard from the Court and what I was told to do was to remove the girls within ten days.

* * * *

Q:  Was there a court order obtained for the removal of the children?

A: There was a court order for [S.M.].

Q:  But not for [L.M.] or [E.M.]?

A:  Not to my knowledge.  I believe that was at the department's discretion.

Vol. I Green Depo. at 151:11-21; 281:25 - 282:5.  Westbay stated: "Q:  Are you referring to a court order also as to [L.M.] and [E.M.]?  A:  I'm referring -- I'm -- a court order for [S.M.] and we were asked to explore the removal of the other two children, as well."  Westbay Depo. at 79:9-13.

Finally, the children's guardian ad litem stated:

Q:  Did you get the feeling that the judge thought the other girls should be moved too?  . . . .

A:  Oh, yeah.

Q: (By Ms. German):  When you say "Oh, yeah," why do you say that?

A: Based on the judge's demeanor, tone of voice, the language that she used, my perception was that she was quite angry.  In fact, I don't have it in the notes here.  I asked the judge to not change the girls' placement without hearing from the therapist, because I had talked with Solveig Maerki who perceived it would be very damaging for those girls to be taken away from Virlace.  However, the judge was quite clear she wanted [S.M.] taken out.  And then she told us she wanted the Department  to look at removing the other girls.  She did not do it at this point because it was not the hearing about [E.M.] and [L.M.] . . . However, I will also say that once the judge ordered [S.M.] removed, I, in consultation with Ginny, decided it would be better to take all three of them at once because I did not want to increase the anxiety for the other girls waiting for the other shoe to fall when they've seen their little sister yanked out.  So it was my recommendation, after that hearing and talking with Ginny, that we do all three of the girls at once.

Q: Was it your opinion that at the next hearing relating to the older girls there was a strong likelihood the judge would direct they be removed?

A:  Oh, yeah.  Yeah, she was quite clear, in my recollection.

* * * *

Q: All right.  And what was your feeling as to what the judge was saying, if anything, about moving the older girls? . . .

A: Well, they weren't my instructions, they were instructions to CYFD.  However, I perceived that CYFD had been instructed to investigate moving the girls, which meant moving the girls.

Q: Why do you say that means moving the girls?

A:  Because of the things that the judge had said, because of the tone of her voice, because of the demeanor in general.

* * * *

-22-

Q:  Are you saying that the judge, in this May 11th hearing, ordered all three girls removed immediately?

A:  She did not because she didn't have -- in this hearing, she didn't have notice or I didn't have notice about a proceeding specifically involving [E.M.] and [L.M.].  I did have the idea that the axe was about to fall for [E.M.] and [L.M.] also.

Q:  But it had not yet fallen?

A:  That's correct.  That's correct.  And my concern was I did not want the three girls separated.  And so because the judge ordered the one child out, after the fact Ginny and I talked and decided that it would be better to move all three of them at once instead of taking [S.M.] out first."

Vol. II Conley Depo. at 59:9 - 61:12; 107:1-20; 129:11-25.

As noted above, the requirement that removal of children occur pursuant to a court order in the absence of exigent circumstances is clearly established.  Not only could a reasonable factfinder conclude that Judge Rivera's statements, as well as the posture of the May 11, 2000 proceeding, indicate she did not order the removal of E.M. and L.M., but a factfinder could also conclude that neither the Defendants nor the guardian ad litem actually believed that they were acting pursuant to a court order in removing the two older children.  The Court thus finds that there is evidence the Defendants did not act reasonably in light of clearly established law and they are, therefore, not entitled to qualified immunity on the Plaintiffs' Fourth Amendment claims.

**III.    THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY WITH REGARD TO THE PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIMS BECAUSE THEY HAVE NOT ALLEGED A CONSTITUTIONAL VIOLATION <u>AGAINST THESE DEFENDANTS.</u>**

In Count II of her Complaint, Hunt asserts that the Defendants violated her rights to procedural due process by failing to provide her with notice and an opportunity to be heard on the removal of the children.  See <u>Kowalczyk v. I.N.S.</u>, 245 F.3d 1143, (10th Cir. 2001)("'The

fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'")(quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)); Jones v. Nuclear Pharm., Inc., 741 F.2d 322, 325 (10th Cir.1984)("The essence of procedural due process is that the parties be given notice and opportunity for a hearing."). In the context of a removal hearing, the relevant New Mexico statute contemplates a hearing involving the children's representative as well as a CYFD representative. See NMSA 1978, § 32A-4-14(B) (2004). While a foster parent is entitled to notice ten days before the removal of any children in the foster parent's care, see § 32A-4-14(A), the statute does not on its face contemplate a hearing with the foster parent.

The record establishes that, at a minimum, Hunt received notice ten days before the removal that Judge Rivera ordered CYFD to remove S.M. There is no evidence in the record that, at any time during that ten days, Hunt voiced an objection to the removal or a request for an opportunity to be heard regarding the removal. See DeWitt Depo. at 125:24 - 126:9 ("Q: What is the purpose of that ten days? A: To provide time for all the parties to be aware of what is going on, to have time for any of the parties who disagree with this to be able to assert their -- their -- Q: Objections? A: -- objections to that[.]"). The Court does not see that these Defendants denied Hunt her rights to due process procedures in terms of an opportunity to be heard on S.M..

Hunt, however, was entitled to ten days notice before the removal of all three children. There is a factual dispute as to how much notice she received with regard to the removal of the two older children. It is undisputed that she received notice the night before the actual removal, and the Defendants assert that Hunt received actual notice at some point earlier based on Maerki's deposition testimony. See Maerki Depo. at 106:20 - 107:12. But Hunt says that she did not know that CYFD was removing the older children until the night before the removal. See Vol. I Hunt Depo. at 113.

-24-

Also, there is evidence the Defendants did not make the decision to remove the older children immediately after the May 11 hearing, but did so later. See Vol. II Green Depo. at 274:14 - 275:16; Vol. II Conley Depo. at 129:11-25.

While it appears that there is a question of fact whether Hunt received sufficient notice with regard to the two older children, Hunt has not established that Green and Westbay are the persons responsible for providing her with notice.  To hold these Defendants liable for monetary damages under § 1983 for a deprivation of Hunt's constitutional rights, Hunt must establish that these Defendants caused the deprivation.  See Martinez v. Mafchir, 35 F.3d 1486, 1491-93 (10th Cir. 1994).  Under Tenth Circuit law, Hunt has not showed these Defendants caused her deprivation.

In Martinez v. Mafchir, the Tenth Circuit considered whether the district court, the Honorable James O. Parker, District Judge, appropriately granted summary judgment in favor of social workers on a procedural due process claim where a natural mother did not receive notice prior to a Neglect Petition hearing after which she lost custody of her children.  Judge Parker relied on New Mexico law regarding the appropriate notice for such a hearing.  The Tenth Circuit agreed with the district court that "we find it shocking that the hearing on the Neglect Petition proceeded in Ms. Martinez' absence. However, we are called upon to decide only whether *these defendants* . . . were responsible for serving Ms. Martinez with notice." Id. at 1493 (emphasis in original).  The district court looked at the evidence in the record as well as the New Mexico Children's Code and determined that "the children's court attorney retained responsibility for ensuring Ms. Martinez actually received notice. . . .  [N]o statute charges social workers with the responsibility for providing notice." Id.

Although the circumstances of the case at hand are slightly different in that the hearing involved is not identical, the Court does not see any material difference in this case and Martinez v.

-25-

Mafchir.  The Tenth Circuit requires a plaintiff in these circumstances to not only demonstrate a constitutional deprivation, but that the defendant before the court is responsible for that deprivation. Hunt has not pointed to evidence in the record or the New Mexico statutes establishing that Green or Westbay retained any responsibility for providing Hunt with the requisite notice in this case.   At the hearing on this motion, Hunt conceded that there was no such evidence in the record.  See Transcript of Hearing at 100:11-18.  The Court finds that Hunt has not sufficiently alleged that the Defendants violated Hunt's procedural due process rights and will, therefore, grant summary judgment in favor of the Defendants on qualified immunity grounds with respect to Count II.

**IV.    THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY WITH REGARD TO HUNT'S SUBSTANTIVE DUE PROCESS CLAIMS BECAUSE HUNT HAS NOT SHOWN THAT THE DEFENDANTS' ACTIONS SHOCK THE COURT'S CONSCIENCE.**

The Plaintiffs assert various substantive due process violations in Counts III (Familial Relations), IV (Duty to Protect), V (Duty to Protect), VI (Danger Creation), and VII (Supervisory Liability).  The Supreme Court of the United States has held that substantive due process claims arise only when the plaintiff can demonstrate "the cognizable level of executive abuse of power as that which shocks the conscience."  County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (citing Rochin v. California, 342 U.S. 165, 172-173 (1952)).  Accordingly, only the most outrageous and egregious governmental actions will create such a claim.  See County of Sacramento v. Lewis, 523 U.S. at 847 n. 8 ("Thus, in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.").  While the Plaintiffs have brought their substantive due process claims under several different theories, the claims all involve the same operative facts and the

same threshold standard -- whether the Defendants' actions may fairly be said to shock the contemporary conscience.  See Transcript of Hearing at 97:2-6 (counsel for plaintiff concedes that the shock the conscience standard applies to all of the Plaintiffs' substantive due process claims).

The "shock-the-conscience" standard is a very high one.  Indeed, in County of Sacramento v. Lewis, the Supreme Court found that police officers who caused the death of an innocent passenger during the high speed pursuit of a motorcycle driver did not violate substantive due process.  See County of Sacramento v. Lewis, 523 U.S. at 855.  The Supreme Court reached this result despite the fact that the pursuit involved speeds of up to 100 miles per hour through residential neighborhoods.  See id. at 837.

Other cases confirm that extremely egregious conduct is necessary before an official will be subject to liability for a substantive due process violation.  See e.g., Garcia v. Miera, 817 F.2d 650, 658 (10th Cir. 1987) (holding that allegations that public school principal's beatings of a third-grade student with a wooden paddle while being held upside down by a teacher caused cuts, bleeding, welts, deep bruises, and permanent scars to child were sufficient to overcome summary judgment on substantive due process claim); Bennett v. Pippin, 74 F.3d 578, 583-584 (5th Cir. 1996) (affirming judgment against sheriff for substantive due process violation when sheriff raped female suspect which he had questioned while he wore badge and gun, told her that he was the sheriff and could do what he pleased, and threatened to throw her in jail if she resisted.).

While the Court has found that there is evidence the Defendants acted unreasonably such that they are not entitled to qualified immunity on the Plaintiffs' Fourth Amendment claims, the Court cannot fairly say that there is evidence that their actions are so egregious or outrageous as to shock the Court's conscience.  The record establishes that Green and Westbay, while perhaps acting in the

absence of a direct court order as required by the Fourth Amendment, were acting consistent with what they believed Judge Rivera's eventual intent to be: that all three children be removed from Hunt's home.

There is evidence in the record that Green had personal issues with Hunt and did not always act in a professional manner toward Hunt.  See DeWitt Report.[3]  Assuming DeWitt's opinions to be a true statement of the facts, as the Court must do at this stage, the Plaintiffs have not pointed to evidence in the record that Green or Westbay acted with the kind of intent to harm Hunt or the children that the courts have required to meet the "shocks the conscience" standard.  Indeed, while they may have later been proven wrong in their assessment of the situation, the evidence is that the Defendants believed that the better course of action for these children would be to keep the siblings together -- pursuant to CYFD policy -- and remove all of them from Hunt's care at the same time.

The Court does not believe that the Plaintiffs have created a genuine issue of material fact whether the Defendants' actions in this case shock the conscience of the Court, and, therefore, there is no genuine issue of fact whether the Defendants violated the Plaintiffs' substantive due process rights.  The Court will grant the motion as to counts III, IV, V, VI and VII.

_____
UNITED STATES DISTRICT JUDGE

---

[3] The Court notes that, to the extent DeWitt is drawing legal conclusions whether the Defendants interfered with the Plaintiffs' constitutional rights, such opinions are not appropriate.  See K.S. v. Board of Douglas County Comm'rs, 2002 WL 31027982, * 7 (D. Kan. Aug. 28, 2002)(disregarding expert opinion drawing legal conclusions when ruling on a motion for summary judgment).

-28-

*Counsel*:

Jeff Romero
Albuquerque, New Mexico

 *Attorney for the Plaintiffs*

Elizabeth L. German
Daniel J. Macke
BROWN & GERMAN
Albuquerque, New Mexico

 *Attorneys for the Defendants*